# STATE OF LOUISIANA

## COURT OF APPEAL, THIRD CIRCUIT

### 24-95

STATE OF LOUISIANA

VERSUS

CHRYSTAL CLUES-ALEXANDER

\*\*\*\*\*\*\*\*\*\*

ON APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 14-247175
HONORABLE KEITH R. J. COMEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**JONATHAN W. PERRY**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Jonathan W. Perry, Sharon Darville Wilson, and Clayton Davis, Judges.

Davis, J., dissents and assigns reasons.

**AFFIRMED;**
**REMANDED WITH INSTRUCTIONS.**

**Jane Hogan**
**310 North Cherry Street**
**Hammond, Louisiana 70403**
**(985) 542-7730**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**Chrystal Clues-Alexander**


**M. Bofill Duhé**
**District Attorney, Sixteenth Judicial District**
**W. Claire Howington**
**Assistant District Attorney**
**300 Iberia Street, Suite 200**
**New Iberia, Louisiana 70560**
**(337) 369-4420**
**COUNSEL FOR APPELLEE:**
**State of Louisiana**

**PERRY, Judge.**

Defendant, Chrystal Clues-Alexander, appeals her sentence given after entering a guilty plea to the charge of manslaughter, in violation of La.R.S. 14:31. Defendant also challenges the denial of her motion to recuse Judge Keith Comeaux. For the reasons stated below, we affirm but remand with instructions.

## FACTS AND PROCEDURAL HISTORY

Since this case resulted from a plea agreement, the facts in the record are not fully developed. The State set forth the following factual basis at the plea hearing:

> On the evening of December 29th, 2013, the defendant, Chrystal Clues Alexander, and her husband, victim Kendall Alexander, were at their residence . . . in Breaux Bridge, St. Martin [P]arish, Louisiana, when they became involved in a domestic dispute. At or around 10:00 p.m., immediately after the victim Kendall Alexander ended a phone call with his mother, defendant Chrystal Clues Alexander intentionally fired her handgun at the victim, who was unarmed, striking him eleven times. The victim, Kendall Alexander, died at the scene from the gunshot wounds inflicted by the defendant.

The factual statement was signed by the attorneys and Defendant and was filed into the record.

On June 26, 2014, a St. Martin Parish grand jury filed a bill of indictment charging Defendant with the second degree murder of her husband, Kendall Alexander, in violation of La.R.S. 14:30.1. On June 13, 2017, the State amended the charge against Defendant to second degree murder with a firearm, in violations of La.R.S. 14:30.1 and La.Code Crim.P. arts. 893.1–893.3. Subsequently, on April 20, 2018, Defendant pled guilty to the lesser offense of manslaughter, in violation of La.R.S. 14:31.

On July 12, 2018, Defendant filed a motion to recuse Judge Keith Comeaux based upon La.Code Crim.P. art. 671(A)(1), (4) and (5). Therein, Defendant argued that Judge Comeaux must be recused due to personal bias or prejudice because he

previously handled protective order proceedings between Defendant and the victim in 2005 and because the handling of those proceedings would be criticized at sentencing. On July 25, 2018, the State filed an objection to Defendant's motion to recuse. Thereafter, Judge Lori Landry was appointed to hear the motion. After several hearings, on June 21, 2019, Judge Landry granted Defendant's motion and recused Judge Comeaux. In her eleven-page ruling, Judge Landry concluded that Judge Comeaux should be recused based on "a substantial risk of actual bias." The State subsequently filed a writ application with this court challenging the trial court's ruling. This court denied the State's writ application. *State v. Clues-Alexander*, 19-535 (La.App. 3 Cir. 11/4/19) (unpublished opinion). Thereafter, the State filed a writ application with the Louisiana Supreme Court, which granted the State's motion and reinstated Judge Comeaux as the trial judge in this case. In its ruling, the Louisiana Supreme Court found that the potential for bias was not high and that "[a]dverse rulings, alone, do not show bias or prejudice requiring recusal." *State v. Clues-Alexander*, 19-1907, p. 1 (La. 2/10/20), 289 So.3d 47, 47.

On July 15, 2020, Defendant filed a "Motion to Withdraw Plea of Guilty," following the United States Supreme Court's ruling in *Ramos v. Louisiana*, 590 U.S. 83, 140 S.Ct. 1390 (2020), which held that Louisiana's majority verdict system violated the Sixth Amendment. On August 20, 2020, following a hearing, the trial court denied Defendant's motion. Defendant subsequently filed a writ application with this court, which granted the writ and reversed the trial court's ruling. *State v. Clues-Alexander*, 20-471 (La.App. 3 Cir. 11/16/20) (unpublished opinion). Afterwards, the State filed a writ application with the Louisiana Supreme Court, which granted the writ and reinstated Defendant's guilty plea. In its ruling, the Louisiana Supreme Court determined that the holding in *Ramos*, 590 U.S. 83, did

not apply to guilty pleas and that a "jurisprudential development subsequent to defendant's knowing and voluntary plea does not render her plea involuntary or unknowing." *State v. Clues-Alexander*, 21-831, p. 1 (La. 5/13/22), 345 So.3d 983, 984, *cert. denied*, ___ U.S. ___, 143 S.Ct. 461 (2022).

Later, on September 6, 2022, Defendant filed a second motion to recuse pursuant to an amendment to the recusal statute. On October 13, 2022, the State filed a "Response to Defendant's Renewed Motion to Recuse." Thereafter, Judge Anthony Saleme, Jr., was appointed to hear Defendant's motion and a hearing was held on October 25, 2022. On November 29, 2022, Defendant's second motion to recuse Judge Comeaux was denied.

On February 8, 2023, after a four-day hearing, the trial court sentenced Defendant to twenty-one years at hard labor. Subsequently, on March 10, 2023, Defendant filed a "Motion for Reconsideration of Sentence," which the trial court denied without a hearing.

Defendant now timely appeals, asserting two assignments of error.

## ASSIGNMENTS OF ERROR

1. The court erroneously denied the renewed motion to recuse Judge Comeaux because there was a substantial and objective basis that would reasonably be expected to prevent his impartiality.

2. The trial court abused its discretion when it failed to adequately consider the sentencing guidelines of Article 894.1 and imposed a grossly excessive and disparate sentence.

## ERRORS PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. Our review of the record shows the trial court did not accurately advise Defendant of the time for filing post conviction relief.

At sentencing, Defendant was told by the trial court, "you have two years within which to file for post-conviction relief. . . . If you fail to file within two years, you lose the right to file." Louisiana Code of Criminal Procedure Article 930.8(A) (emphasis added) provides that a defendant has "two years after the *judgment of conviction and sentence* has become final" to seek post conviction relief. Thus, we find the advice given by the trial court at sentencing was only partially accurate.

In *State v. Hudson*, 23-760, p. 2 (La. App. 3 Cir. 5/8/24) (unpublished opinion) (2024 WL 2046021), this court found it was inadequate when the trial court advised that Hudson had "'two years from the date this conviction becomes final to file an application for post-conviction relief.'" *See also State v. Wilhite*, 55,023, 55,024, 55,025, 55,026, 55,027, 55,028 (La.App. 2 Cir. 5/17/23), 361 So.3d 1246, *writ denied*, 23-847 (La. 3/5/24), 379 So.3d 1271; *State v. Robertson*, 53,970 (La.App. 2 Cir. 6/30/21), 322 So.3d 937; and *State v. Simpson*, 50,334 (La.App. 2 Cir. 1/13/16), 186 So.3d 195.

Considering the aforementioned jurisprudence, we instruct the trial court to inform Defendant of the correct provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to her within ten days of the rendition of this opinion and to file written proof that Defendant received the notice in the record of these proceedings. *See State v. Green*, 21-14 (La.App. 3 Cir. 10/27/21), 329 So.3d 917.

## LAW AND DISCUSSION

*Motion to Recuse*

In her first assignment of error, Defendant claims the trial court erred in denying her renewed motion to recuse. Defendant notes that a trial court's ruling on a motion to recuse is generally not reviewable on appeal. However, Defendant

4

argues that since the trial court did not comply with the notice requirement of La.Code Crim.P. art. 684, her renewed motion to recuse is reviewable on appeal.

Louisiana Code of Criminal Procedure Article 684 provides, in pertinent part:

> B. If a judge is recused over the objection of the state or the defendant, or if a motion by the state or the defendant to recuse a judge is denied, the party's exclusive remedy is to apply for a review of the ruling by supervisory writs. A ruling recusing or refusing to recuse the judge shall not be considered on appeal.
>
> C. Upon ruling on a motion to recuse a judge, the judge shall advise the defendant in open court or in writing that the ruling may be reviewed only by a timely filed supervisory writ to the appellate court and shall not be raised on appeal.

Additionally, the 2022 Comments to La.Code Crim.P. art. 684 state:

> (c) Because Paragraph B of this Article creates an exception to a defendant's constitutional right to an appeal, Paragraph C requires the judge to advise the defendant that the recusal ruling may be reviewed only by a timely filed supervisory writ and cannot be raised on appeal. This notice must be given in open court or in writing, and the form of the notice will likely depend upon the manner in which the recusal ruling is made. The failure of the judge to provide the required notice to the defendant may give rise to the issue of recusal being reviewed on appeal.

A review of the record reveals that the trial court failed to notify Defendant that she must seek supervisory review of the ruling on her renewed motion to recuse as required by La.Code Crim.P. art. 684. We note, however, that at a status hearing held December 12, 2022 (a couple of weeks after the denial of the renewed motion to recuse), defense counsel informed the trial court that he was not going to appeal the denial of the motion. Defense counsel told the presiding trial judge, Judge Comeaux, that he accepted the sentencing by him.

Although we have found no cases discussing the 2022 amendment, we find the 2022 Comments suggest that Defendant may raise the issue on appeal since she

5

was not advised that the issue must be raised by supervisory writs. Accordingly, we will address the merits of the motion to recuse before us.

On appeal, a trial court's ruling on a motion to recuse will not be reversed absent an abuse of discretion. *Menard v. Menard*, 19-580, 19-581 (La.App. 3 Cir. 3/11/20), 297 So.3d 82.

Louisiana Code of Criminal Procedure Article 671 (emphasis added) provides, in pertinent part:

> A.      In a criminal cause, a judge of any trial or appellate court shall be recused upon any of the following grounds:
>
> (1)      The judge is biased, prejudiced, or personally interested in the cause to such an extent that the judge would be unable to conduct a fair and impartial trial.
>
> . . . .
>
> (6)      The judge would be unable, for any other reason, to conduct a fair and impartial trial.
>
> B.      In a criminal cause, a judge of any trial or appellate court shall also be recused **when there exists a substantial and objective basis that would reasonably be expected to prevent the judge from conducting any aspect of the cause in a fair and impartial manner.**

We note that the Legislature added subsection B to the recusal articles in 2022, which went into effect on August 1, 2022. *See* 2022 La. Acts. No. 42, § 1. In the 2022 Comments to La.Code Crim.P. art. 671, the Legislature articulated its reasons for modifying the recusal articles, stating:

> (i)      A new Paragraph B has been added to provide an additional mandatory ground for recusal when a substantial and objective basis exists that would reasonably be expected to prevent the judge from conducting any aspect of the cause in a fair and impartial manner. This provision is intended to serve as a catch-all supplementing the mandatory grounds for recusal set forth in Paragraph A and to incorporate a clearer, more objective standard than the language of Canon 3C of the Code of Judicial Conduct, which provides that a judge

6

should recuse himself when "the judge's impartiality might reasonably be questioned."

As previously noted, Defendant filed a renewed motion to recuse based upon the amended recusal statute, La.Code Crim.P. art. 671(B), arguing that there was a substantial and objective basis that would reasonably be expected to prevent Judge Comeaux from conducting her sentencing hearing in a fair and impartial manner.

Following a hearing on Defendant's renewed motion to recuse, Judge Saleme issued written reasons for his denial of Defendant's motion, stating, in pertinent part:

> The presumption is that a judge is impartial. *State v. Anderson*, 96-1515 (La.App. 3 Cir. 4/29/98), 748 So.2d 766, 768. Judge Comeaux made rulings in a case involving a petition for order of protection in which the defendant and her victim were the parties. The comments to LSA-C.Cr.P. Art. 671 specifically provide that a district judge's signing of restraining orders in a civil case involving the same allegations as charges in a criminal prosecution do not subject that judge to recusation for having performed a judicial act in another cause in another court. These prior adverse rulings performed within Judge Comeaux's authority as a district court judge are not grounds for his recusal. That the defendant will be critical of these decisions at a future sentencing hearing should not change that. To rule otherwise would ignore Justice Crichton's concurring opinion in *State v. Clues-Alexander*, 19-1907 (La. 2/10/20), 289 So.3d 47 wherein he warns that recusal in this case could be viewed as "precedent for a party to criticize past judicial orders in a concerted effort to force a recusal, thereby effectively engaging in the distasteful exercise of judge shopping."

> Based on the Court's review of the exhibits offered by the defendant and the State and applying it to the amended LSA-C.Cr.P. Article 671 B, it is the finding of this Court that the actions of Judge Comeaux on which the defendant bases her motion to recuse are prior adverse rulings that were performed within his authority as a district court judge and that there is no substantial and objective basis that would reasonably be expected to prevent him from conducting any aspect of the cause in a fair and impartial manner.

> For these reasons, defendant's Motion to Recuse Judge Comeaux Under the Amended LA C.CR.P. [Article] 671(B) is denied.

Now, Defendant claims that the trial court erred in denying her renewed motion to recuse. First, Defendant argues that the trial court erred in its ruling

7

because "the grounds for the renewed motion to recuse encompassed a substantial change in law and was not limited to a mere prior adverse ruling." According to Defendant, even if she filed a renewed motion to recuse based on the same facts, the court was still obligated to consider her claim under the more expansive law pursuant to *State v. Neveaux*, 22-426 (La.App. 5 Cir. 9/28/22), 350 So.3d 592. In *Neveaux*, the fifth circuit held that since the defendant provided a new ground for recusal, the trial court should have applied the standard set forth in La.Code Crim.P. art. 671(B) to the facts of the case to determine if she should recuse herself or refer the motion to another judge.

Next, Defendant asserts that the trial court erred in its ruling because "the commentary to Article 671 pertaining to recusal motions and protective orders is inapplicable." According to Defendant, the case in which the commentary to Article 671 is based upon *State v. Williams*, 229 La. 622, 86 So.2d 403 (1956), involved a criminal and a civil matter. Both matters in the case at hand, however, involve only criminal matters. Specifically, Defendant claims that "the 2005 restraining order case of *Chrystal Clues v. Kendall Alexander* is the <u>exact</u> same cause as what has now tragically become *State of Louisiana v. Chrystal Clues-Alexander*."

Then, Defendant contends that "pursuant to Article 671(B) there was a substantial and objective basis that would reasonably be expected to prevent Judge Comeaux from conducting the sentencing hearing in a fair and impartial manner." According to Defendant, the victim was a former member of law enforcement who "had dealings" with Judge Comeaux in the past. Considering Judge Comeaux's personal ties with the victim, Defendant insists Judge Comeaux was unable to be fair and impartial. We note the argument regarding Judge Comeaux's personal ties with

the victim was not raised in the trial court and, thus, will not be addressed by this court. *See* La.Code Crim.P. art. 841.

Lastly, Defendant claims that Judge Comeaux's commentary at sentencing and the imposition of an excessive sentence further demonstrated his inability to remain impartial. According to Defendant, Judge Comeaux refused "to accept the psychological features of intimate partner violence" as mitigation at sentencing. Defendant further notes that Judge Comeaux minimized the years of abuse Defendant suffered in her relationship with the victim. Consequently, Judge Comeaux failed to impartially preside over her case. Therefore, Defendant asserts the trial court erred in denying her renewed motion to recuse.

On the contrary, the State argues that the trial court did not abuse its discretion in denying Defendant's renewed motion to recuse. According to the State, Defendant's motion to recuse is "based on the same fundamental error—that a party's criticism of a judge's rulings can be sufficient to force a judge from the case." Although Defendant centers her renewed motion to recuse on a new legal basis, which is the "catch-all" provision of La.Code Crim.P. art. 671(B), the State contends Defendant's "underlying assumption remains that Judge Comeaux would not be fair and impartial in this matter." Moreover, the State argues that Defendant's bases for her motion to recuse were "firmly rejected by the Louisiana Supreme Court," which held that Judge Comeaux's handling of a protective order hearing in 2005 was "an adverse ruling performed within a judge's authority." *Clues-Alexander*, 289 So.3d at 47. All in all, the State asserts that "Judge Comeaux's rulings, at minimum, were within his authority" and that "adverse rulings alone do not show bias or prejudice warranting recusal." Therefore, the State maintains that the trial court did not abuse its discretion in denying Defendant's renewed motion to recuse.

9

After a review of the record, we find the trial court did not abuse its discretion in denying Defendant's renewed motion to recuse. Defendant argues the same factual basis in her renewed motion to recuse as she did in her original motion to recuse. The supreme court found this factual basis did not support a motion to recuse under the standard that existed before the 2022 amendment:

> Writ granted. The order granting Judge Comeaux's recusal is hereby reversed. We find it noteworthy the motion to recuse was filed after Judge Comeaux had already accepted the defendant's guilty plea, albeit before sentencing. Further, we do not find the potential for bias for the average judge in this position is unconstitutionally high. Rather, we find instructive a comment to La. Code Crim. P. art. 651:[1] "If the district judge has signed restraining orders in a civil suit involving the same allegations as the charges in the criminal prosecution, he is not subject to recusation for having performed a judicial act in the cause 'in another court.'" Even if the dismissal of the protective order was legally incorrect, and we are not expressing such an opinion, it would still only be classified as an adverse ruling performed within a judge's authority. Adverse rulings, alone, do not show bias or prejudice requiring recusal.

*Clues-Alexander*, 289 So.3d at 47.

The question now is whether this factual basis supports a motion to recuse under the 2022 amendment—whether there is a substantial and objective basis that would reasonably be expected to prevent the judge from conducting any aspect of the cause in a fair and impartial manner. La.Code Crim.P. art. 671(B). The supreme court found the *potential* for bias in this case was not unconstitutionally high. Since it found only a potential for bias, the supreme court would not likely have found the same factual basis constituted a "substantial and objective" basis for bias. As an example of a case in which the supreme court found the facts supported the finding of substantial and objective bias, the supreme court stated the following:

> Writ granted. Under the unique circumstances presented in this first degree murder prosecution, which seeks the death penalty, we reverse the trial court's denial of defendant's motion to recuse Judge

---

[1] The article that should have been cited is La.Code Crim.P. art. 671.

10

Stromberg. For the reasons assigned in Judge Miller's dissent, *State v. Mire*, 2023-322 (La. App. 1 Cir. 7/6/23) (unpub'd, available at 2023 WL 4362898) (stating, "The judge's brother is a detective with the Ascension Parish Sheriff's Office and is a link in the chain of custody for evidence that the state intends to present at trial, as he logged in and transported evidence for testing related to this case."), we find a substantial and objective basis for recusal which on its face may cause doubt as to neutrality. *See* La.C.Cr.P. art. 671(B). Out of an abundance of caution in this capital murder prosecution, and in the interest of justice and to safeguard public confidence in the judiciary, we therefore reverse and vacate the lower court judgments. We remand for reallotment.

*State v. Mire*, 23-1010, p. 1 (La. 12/5/23), 373 So.3d 709, 710.

Unlike the present case, the grounds for recusal in *Mire* were based on the trial judge's personal relationship, not his actions in the matter before him. We find nothing in the renewed motion to recuse which would cause the supreme court to find a substantial and objective bias exists in this case. Thus, considering the abuse of discretion standard that must be used when reviewing a trial court's ruling on a motion to recuse, we find no error in the trial court's denial of the renewed motion to recuse filed in this case. Accordingly, Defendant's first assignment of error lacks merit.

*Sentence*

In her second assignment of error, Defendant argues the trial court abused its discretion by failing to adequately consider the sentencing guidelines set forth in La.Code Crim.P. art. 894.1 and by imposing a grossly excessive and disparate sentence.

> In reviewing a sentence for excessiveness, an appellate court uses a two-step process. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. *State v. Kelly*, 52,731 (La.App. 2 Cir. 6/26/19), 277 So.3d 855, *writ denied*, 2019-01845 (La. 6/3/20), 296

So.3d 1071. The trial court is not required to list every aggravating or mitigating circumstance so long as the record reflects that it adequately considered the guidelines of the article. *State v. Smith*, 433 So.2d 688 (La. 1983); *State v. Kelly*, supra. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. *State v. Jones*, 398 So.2d 1049 (La. 1981); *State v. Thompson*, 50,392 (La.App. 2 Cir. 2/24/16), 189 So. 3d 1139, *writ denied*, 2016-0535 (La. 3/31/17), 217 So. 3d 358. There is no requirement that specific matters be given any particular weight at sentencing. *State v. Thompson*, supra.

Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. art. I, § 20, if it is grossly out of proportion to the severity of the crime or nothing more than a purposeless and needless infliction of pain and suffering. *State v. Dorthey*, 623 So.2d 1276 (La. 1993); *State v. Kelly, supra*. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. *State v. Weaver*, 2001-0467 (La. 1/15/02), 805 So.2d 166; *State v. Kelly, supra*.

The trial court has wide discretion in the imposition of sentences within the statutory limits and such sentences should not be set aside as excessive in the absence of a manifest abuse of that discretion. *State v. Williams*, 2003-3514 (La. 12/13/04), 893 So. 2d 7; *State v. Kelly, supra*. A trial judge is in the best position to consider the aggravating and mitigating circumstances of a particular case, and, therefore, is given broad discretion in sentencing. *State v. Allen*, 49,642 (La.App. 2 Cir. 2/26/15), 162 So.3d 519, *writ denied*, 2015-0608 (La. 1/25/16), 184 So.3d 1289. On review, an appellate court does not determine whether another sentence may have been more appropriate, but whether the trial court abused its discretion. *State v. Kelly, supra*.

*State v. Bell*, 53,712, pp. 5–7 (La.App. 2 Cir. 1/13/21), 310 So.3d 307, 311–12.

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648

(La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96)[,]; 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, p. 5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005–06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261. "Generally, maximum sentences are reserved for the most serious violation of the offense and the worst type of offender." *State v. Herbert*, 12-228, p. 5 (La.App. 3 Cir. 6/13/12), 94 So.3d 916, 920, *writ denied*, 12-1641 (La. 2/8/13), 108 So.3d 78.

*State v. Harville*, 23-413, pp. 3–5 (La.App. 3 Cir. 11/29/23), 374 So.3d 1139, 1142–43. Additionally, in *State v. Wortham,* 47,431, pp. 4–5 (La.App. 2 Cir. 11/14/12), 107 So.3d 132, 135–36 (emphasis added), the second circuit provided a useful recitation of the law:

> **Where the record shows an adequate factual basis for the sentence imposed, remand is unnecessary even where the trial court has not fully complied with the sentencing guidelines of La.C.Cr.P. art. 894.1**. *State v. Lanclos,* 419 So.2d 475 (La.1982); *State v. McGraw*, [616 So.2d 262 (La.App. 2 Cir. 1993).] The important elements which should be considered are the defendant's personal history, prior criminal record, seriousness of offense, and the likelihood of rehabilitation. *State v. McGraw, supra.* The trial court is not required to weigh any specific matters over other matters. *State v. Moton*, 46,607 (La.App.2d Cir.9/21/11), 73 So.3d 503, *writ denied*, 11-2288 (La.3/30/12), 85 So.3d 113; *State v. Caldwell,* 46,645 (La.App.2d Cir.9/21/11), 74 So.3d 248, *writ denied*, 11-2348 (La.4/27/12), 86 So.3d 625.

. . . .

**When a defendant has received a significant reduction in potential exposure to confinement through a plea bargain, the trial court has great discretion in imposing even the maximum sentence possible for the pled offense**. *State v. Fatheree*, [46,686 (La.App. 2 Cir. 11/2/11), 77 So.3d 1047]; *State v. Germany*, 42,239 (La.App.2d Cir.4/30/08), 981 So.2d 792.

Originally, Defendant was charged with the second degree murder of her husband, Kendall Alexander. Second degree murder refers to "the killing of a human being [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" La.R.S. 14:30.1(A)(1). Second degree murder requires life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. La.R.S. 14:30.1(B).

However, Defendant pled guilty to the lesser offense of manslaughter, a crime "which would be murder . . . but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31(A)(1). As noted by the trial judge, manslaughter requires imprisonment at hard labor for no more than forty years without the restriction on parole eligibility. La.R.S. 14:31(B). Defendant was sentenced to twenty-one years; thus, Defendant received a mid-range sentence.

At the four-day sentencing hearing, both the State and Defendant called witnesses to testify. Sergeant Abner Williamson ("Sgt. Williamson") of the Louisiana State Police testified that on December 29, 2013, he was conducting a traffic stop near the Kristle Cove Apartments when he noticed several police officers appear. According to Sgt. Williamson, the police officers were responding to a call regarding an officer-involved shooting in the area. Sgt. Williamson stated that after he completed the traffic stop, he went to the scene where he observed "a black male

14

subject laying on the ground in a pool of blood" and "a handgun near the sink" in the kitchen.

Jeff Goudeau ("Goudeau"), an expert in crime scene reconstruction, with an emphasis in bullet trajectories and blood splatter analysis, testified that on January 9, 2014, he was asked to go to the scene of the shooting to determine the trajectories of the bullets. According to Goudeau, the shooting occurred at an apartment located at 450 East Mills Avenue in Breaux Bridge, Louisiana. Thereafter, the following colloquy occurred:

Q. So, why don't you talk about each of these trajectory rods individually? And tell the court what each one of those means and how you made that determination.

A. The first one here is what I refer to in my report as "bullet hole A". Believe it was approximately thirty-seven-and-a-half inches from the floor. And when we ran the trajectory back, you can see that this shot originated from somewhere near this recliner. Bullet hole "B" here was a little bit lower. I think it was about twenty-four inches off -- off the ground, if -- if I'm not mistaken. And it comes back here, again, to that same -- same area. So, you could see the shooting --there's -- these shots would have been fired by someone sitting or, you know, it -- they come back lower to someone being right there at the recliner. This one here we were not able to get a very accurate trajectory on, because the detectives, the night of the scene, had attempted to recover the bullet, so the hole was slightly bigger. All we know is that it comes back to this. There was a secondary impact, like, into a stud or something in the wall. So, we know it comes back this way, but I -- I couldn't get a really good height on that one, because it wasn't in its original scene. But the -- I'm sorry, its original state. But these two definitely come [sic] back to someone being, you know, either sitting or just right there in front of that recliner --

Goudeau testified that he could not determine the exact position of Defendant nor the victim at the time of the shooting. However, Goudeau noted that "there were a total of eleven cartridge cases recovered."

Marie Alexander ("Ms. Alexander"), the victim's mother, also testified, stating:

A.      Okay. I'm not making a big ***, because it's been nine years and I've -- I'm already where I'm -- I'm past all of this.  But, for nine years, I never spoke to Chrystal.  And I just wanted to tell Chrystal that, in my heart, I know.  I know what happened because Kendall called me that night.  I know it happened.  And I just want you to know that I know what happened.  And I --

. . . .

A.      And I'm not dwelling on the past or anything.  It's just that I want you to know that I feel you made a conscious decision that night to kill Kendall, to protect what was going on between you and yours.  And that's all I have to say.  But I'm good.  I'm very good.  I just wanted you to know that I know.  I'm good.  That's it.

Ms. Alexander then said that she knew the relationship between Defendant and the victim "was toxic from day one" and that "they were rough on each other."

Dr. Christopher Tape ("Dr. Tape"), an expert in forensic pathology, testified that he performed an autopsy on the victim.  Dr. Tape stated that other than the gunshot wounds, the victim had no injuries to his body.  According to Dr. Tape, the victim had eleven gunshot wounds—nine shots entered his body from the back and exited his body towards the front, one shot entered from the front of his abdomen and exited from the back of his abdomen, and one shot grazed him.  Dr. Tape ultimately concluded that the fatal shot was the gunshot wound to the victim's head.  According to Dr. Tape, either the victim or the gun was moving at the time of the shooting.  Dr. Tape noted that if the victim would have received medical intervention, he would have survived the shooting, absent the gunshot wound to his head.

Frank Garcia ("Trooper Garcia"), a Senior Technical Support Officer with the Louisiana State Police, testified that he was the lead investigator in the case.  According to Trooper Garcia, the Louisiana State Police normally investigates officer-involved shootings; however, the case was treated "as a homicide."  Trooper

Garcia stated that on December 29, 2013, he received a call from his lieutenant around 11:00 p.m. requesting his assistance on the case. Trooper Garcia stated that he arrived at the scene at 11:44 p.m., but the original report of shots fired occurred at 10:02 p.m.

Trooper Garcia described the scene as follows:

Q.    Okay.   So, what did you see when you walked into the apartment?

A.    When I walked in the apartment, there was the male subject lying on the ground. . . .   There's a male subject lying on the ground, face-down.   I believe he was looking to the left.   There was, obviously, furniture, Christmas presents, [and a] table set up.   I mean, that was -- and then we walked through the kitchen.   There was a firearm sitting on the kitchen counter by the sink.   Then, we walked into the bedroom and saw, you know, looked at the bedroom and then came back out. Make [sic] sure there was nothing else.   Came back out.

According to Trooper Garcia, the murder weapon was a "Glock 45."  Trooper Garcia stated that he did not find a gun that belonged to the victim, but he did find .40 caliber bullets in the victim's truck.

Trooper Garcia also discussed Defendant seeking medical attention after the shooting, stating:

Q.    It's all right.  When you -- when you arrived, the Defendant was either leaving or no longer at the scene, right?

A.    Correct.   She was -- I think she was there but left shortly afterwards.  Or, she had just left.

Q.    Okay.  Do you know where she went?

A.    The hospital.

Q.    All right.  Do you know why she went to the hospital?

A.    She was complaining of injuries sustained during an altercation --

Q.    Did --

A.    -- between her and Kendall Alexander.

Q.    Did your subsequent investigation show that she had any substantial injuries?

A.    Substantial?  No.

Q.    All right.  Did she have any injuries at all?

A.    The hospital noted slight tenderness to the back of the head, and a red mark on one of the sides of her chest.

Trooper Garcia testified that he interviewed Linda Landry ("Ms. Landry") after the shooting.  According to Trooper Garcia, Ms. Landry stated:

A.    She was -- she was awoken around 10:00 at night -- she didn't know the exact time, but she said it was around 10:00 -- to the sound of four loud bangs.  So, she went out to her window to look out into the parking lot to see what was going on.  Didn't see anything.  Came back to her kitchen to get some water, at which time -- I guess her kitchen butts up to Chrystal Clues' apartment kitchen.  And that's when -- when she was in her kitchen, that's when she's [sic] heard Chrystal Clues yelling that she had just shot Kendall.  Which, based on that and based on the other interviews that I did, it was -- what she heard was Chrystal Clues talking to Reggie Clues -- her brother -- saying that she had shot Kendall.  And that phone call would've happened, according to the records, at like, 10:02, I think.

Trooper Garcia noted that Ms. Landry was the only person he interviewed from the apartment complex.  He interviewed seven or eight others, however, who spoke about domestic incidents between Defendant and the victim.  According to Trooper Garcia, Defendant made the following statement after the shooting:

Q.    So, what did she tell you in that affidavit about what happened that night?

A.    She said that -- and of course, I'm referring to [sic] so I don't misquote or anything, but -- that night, while they were in the apartment at the conclusion of a Saints' football game.  He became -- Kendall -- became verbally hostile towards Chrystal Clues and promised to kill her.  They stepped outside to smoke and that's when Kendall Alexander grabbed her hair, dragged her back into the apartment, and -- and said, and I quote, "Bitch, you will die tonight."  End-quote.  And then, after that, the -- Kendall Alexander began slapping her on the face and threw

her across the bedroom, knocking down perfume and items off the dresser as she fell to the floor.

. . . .

THE WITNESS:

Okay. Yeah. Sure. I spoke on paragraphs -- just now, spoke on paragraph thirteen. I'll start from there. So, now I'm going to fourteen. "Kendall Alexander continued to threaten to kill her and her son, Jalen." And, paragraph fifteen, "She attempted to leave the apartment[,] but Kendall grabbed her and kept her from leaving the apartment." And then, skipping down, paragraph eighteen is where it's written that, "Kendall began bashing the back of her head on the floor and --" it doesn't say how, but at some point, Chrystal Clues was able to retrieve her service weapon in a paddle holster, and placed it in the small of her back while she's getting her head bashed on the floor.

It doesn't -- I don't know where this bashing of the head occurred. Like, in the living room, bedroom, kitchen, wherever. I don't know where the weapon was before she grabbed it. It just says that while -- while Kendall was bashing her head on the floor, she was able to get a weapon and put it in the small of her back.

After she put the -- the weapon in the small of her back, she tried to run out the apartment through the front door, but -- and this is paragraph nineteen -- but Kendall grabbed her and threw her against the recliner in the living room. Paragraph twenty says, "She begged to -- begged Kendall to let her go, and she didn't want to die that night, and that he would get the shotgun in the bedroom closet." Paragraph twenty-one says, "As she -- that Kendall Alexander was choking her while she was seated in the recliner. At which point she reached for the -- to her back to get the service weapon out, and at the same [time] Kendall Alexander also reached behind her back." Maybe to go for the weapon.

THE COURT:

Go for her weapon?

THE WITNESS:

Go for her weapon. Yes, sir. Paragraph twenty-two says that, at that point when she's reaching for her weapon

in the small of her back, Kendall Alexander's reaching for her -- her weapon in the small of her back. She was able to kick him back -- or kick him to push him away, or -- yeah. Push or kick him away several feet. And then, Kendall aggressively moved toward her, although it's not described how. At which point, she drew her weapon and fired.

She remembers -- in paragraph twenty-three, she remembers firing multiple rounds, but does not know how many were fired and which shots hit Kendall. Paragraph twenty-four, she became hysterical and called her brother, Lieutenant Colonel Reggie Clues and her Major, Keith* Babineaux. And then paragraph, that, "at the time of the shooting, she believes she was in danger of great bodily harm or imminent death." And the killing was in self-defense.

And then paragraph twenty-six, and I quote that, "she makes this affidavit based on her best recollection of the events of a traumatic experience on the evening of December 29th, 2013."

Thereafter, Tropper Garcia discussed how Defendant's statement influenced his investigation:

Q. No. When you received this affidavit, did that affect your investigation in any way?

A. Only in the sense that it gave me stuff to look at even harder, because some of the things written in there did not match up with the evidence that I had seen the night before.

Q. Would you say it raised your suspicions?

A. Very much.

Q. Okay. So, what are some of [sic] things that were inconsistent with either the physical evidence, like you just said, or common sense?

A. It's mainly the -- the physical evidence. The -- the recliner was very light. I've -- I've investigated as a Trooper and prior to becoming a Trooper, many domestic assault situations. In large houses and small apartments. And the -- the fact that the recliner was facing the T.V., none of the stuff -- the DVDs that you saw, the fish tank, the stuff on the fish tank -- none of that was knocked over. The couch wasn't moved. That flimsy table right there underneath the mirror, that was still upright and okay. But yet, there was this violent altercation. And

then, looking in the bedroom, there's a bunch of stuff that's still on the dresser that hadn't been knocked over, or moved, or pushed out the way. Pushed to one side or the other side. There -- there was [sic] a lot of questions that raised in my mind as to the -- the accuracy of what was written in the affidavit as to what happened, because it -- it wasn't matching up. It just -- had there been a violent fight, I would have expected to see more disarray inside the apartment. Especially in the living room, where supposedly all this happened. Which I didn't see.

. . . .

Q. So, you have two relatively large people in a small space. Would you expect there to be more signs that some kind of an altercation had happened?

A. Correct. Which is why I said that just the -- the fact that there were no signs was what raised the flags, because I would've expected, on quite a violent fight like this, to see something more out of place than what there was.

Trooper Garcia testified that Patience Thibodeaux ("Ms. Thibodeaux"), the victim's cousin, stated that she went to Defendant's apartment around 3:00 p.m. on the day of the shooting and that she did not observe any animosity between Defendant and the victim. However, Trooper Garcia stated that Ms. Thibodeaux noted that the victim had "hit and choked" Defendant in the past. Trooper Garcia also noted that the victim called Ms. Thibodeaux around 10:00 p.m. that night. According to Trooper Garcia, the victim called Ms. Thibodeaux seeking information about a man with whom Defendant was allegedly having an affair.

Dr. Stephen Darbonne ("Dr. Darbonne"), an expert in internal and emergency medicine, testified that the headshot sustained by the victim would have caused "immediate loss of consciousness" as well as "no more purposeful movements." According to Dr. Darbonne, the headshot was "the fatal shot." Furthermore, Dr. Darbonne stated that none of the other shots were instantly fatal.

Dr. Darbonne also testified regarding the victim's movements during the shooting:

Q.     Thank you.  From what you've seen of the autopsy pic -- pictures and what you've seen in the report of Dr. Tape, can you make a fair conclusion that when Mr. Kendall Alexander was shot those different times, he was always moving?

A.     Well, there was [sic] shots to the front.  There's [sic] shots to the side and there's [sic] shots to the back.  Unless the shooter was moving around a stationary target, then he was -- had to -- had to be moving when he was getting shot.

According to Dr. Darbonne, the victim would have survived the shooting, if he had not been shot in the head.

Ronald Theriot ("Sheriff Theriot"), former Sheriff of St. Martin Parish, testified that he knew Defendant personally and professionally, as she was a former employee at the St. Martin Parish Sheriff's Office.  According to Sheriff Theriot, Defendant was dependable, a good employee, and never had any complaints filed against her.   Sheriff Theriot ultimately recommended that Defendant be sentenced to six months of house arrest.

Morgan Bernard ("Ms. Bernard"), a board certified and licensed behavior analyst, who specializes in the treatment of children with autism, testified that she previously provided treatment for Defendant's four-year-old son, Noah.  According to Ms. Bernard, Defendant was "caring," "loving," and "extremely doting" to Noah.  Ms. Bernard stated that Defendant was in "constant contact" with her regarding Noah's treatment and made sure that Noah got everything he needed to ensure his success later in life.  Ms. Bernard noted that due to Noah's needs and the fact that Defendant was Noah's "primary caregiver," she recommended that Defendant be sentenced to six months of house arrest as well.  Ms. Bernard ultimately concluded that Noah would regress if Defendant was taken from the home or was unable to care for him.

Espinola Alexander Quinn ("Ms. Quinn") testified that she had known Defendant for over thirty years, as they met while they were working together at the St. Martin Parish Sheriff's Office. Ms. Quinn stated that after the shooting, she and Defendant became close friends, and they would study the Bible together. According to Ms. Quinn, Defendant expressed remorse for what happened between her and her husband. Ms. Quinn ended her testimony by asking the court to sentence Defendant to six months of house arrest.

Karen Mouton ("Ms. Mouton"), a former employee of the St. Martin Parish Sheriff's Office, testified that she and Defendant had been close friends since high school. According to Ms. Mouton, Defendant was someone that she confided in, relied on, and trusted. Ms. Mouton also described Defendant as a great mother. Ms. Mouton further stated that Defendant expressed remorse about what happened.

Commander Craig Allen ("Commander Allen"), an expert in the function of firearms and human movement dynamics, testified regarding "cadence time," which is the average amount of time it takes a person to pull the trigger. According to Commander Allen, there are three categories of individuals when it comes to shooting: (1) novice, those who have never fired a handgun; (2) intermediate, those who have rifle or shotgun experience growing up but never fired a handgun; and (3) expert, those who have completed firearms training. Commander Allen stated that Defendant, as a nineteen-year police officer, was "well-adept with firearms," so she could have fired eleven shots in as fast as two seconds.

Beth Meeks ("Ms. Meeks"), an expert in domestic violence, victim and offender behavior, and risk assessment, testified that she assessed the relationship between Defendant and the victim through previous incident reports, text messages, and interviews with Defendant. According to Ms. Meeks, the victim was the

"abuser" and Defendant was the "victim." Ms. Meeks stated that the totality of the

evidence led her to reach that conclusion, stating:

> A. The totality of evidence. The totality of information that I reviewed. As an example, I've -- I reviewed text messages where he, very specifically, made threats and alluded to prior behavior. I saw multiple witness statements where there were people who talked about having witnessed behavior by both parties.
>
> Looking at things like protection orders and various witness statements. There was [sic] -- there were multiple times when it appeared that Chrystal had -- had asked for help, sought help, moved to attempt to be separated from Mr. Alexander. The record was devoid of any indication, to me, that he had ever expressed fear of her. That he had ever been substantially injured by her. That he had ever called for help. That he had ever tried to move away from her.

Ms. Meeks also indicated that she saw several "lethality factors," which are

referred to as behaviors that would substantially increase the risk of a homicide, in

this case. Ms. Meeks stated:

> [A.] I did. There were -- there were several things in this case that are highly-correlated to homicide. Direct --
>
> [Q.] Such as?
>
> [A.] -- direct threats to kill are one. Confinement in a space. So, not letting -- keeping someone in the house and not letting them leave. The presence of weapons, you know, increases the risk for homicide by 500%. Strangulation, actually, is a stronger indicator of homicide than the presence of firearms. It increases the potential for a -- a later homicide by about 700%.

Ms. Meeks further testified that strangulation was "a very common pattern"

in the relationship between the victim and Defendant. According to Ms. Meeks,

Defendant's case seemed as though it was a typical domestic violence incident,

stating:

> A. Yeah. I didn't see anything that was abnormal or that gave me concern. This case reads very much like most domestic violence cases, in a number of ways. It seemed more volatile. It was cycling very quickly at the end. There were a lot of -- there were some behaviors that you don't typically see. I -- in my opinion, there was some "death

24

planning" behaviors that Mr. Alexander undertook in the last few days. That's abnormal, but the totality of the life experience, the assaults that happened, attempting to move away from the abusive partner and not being able to do that. The kind of statements that they gave were very consistent with the things I normally see in domestic violence cases.

Q. At the time of the shooting, is it your -- what is your opinion about whether Chrystal's fear was reasonable or not?

A. It -- given the strangulation alone, that fear would be very reasonable. Simply -- we know that that's a very lethal activity. That it could be lethal in seconds. If you've had altered consciousness at all, it can make it very difficult for you to extract yourself from the situation. And again, usually, head injuries accompany strangulation. Someone is, you know, in this case, had their head hit on the floor or hit on a wall. Something like that. And so, you're talking about, sort of, compounding injuries. The injury of losing oxygen to the brain, as well as, potentially, the physical injury of, like, a concussion or something. So, it -- often, victims are disoriented. If they've experienced strangulation previously, they typically describe that like a near-death experience. And so, when that begins to happen again, they're -- they're generally very afraid that they're in a lethal situation.

Ms. Meeks also testified regarding the victim's behavior leading up to the

shooting:

[A.] From what I could see, he appeared very distressed. He was trying to get a hold of Chrystal. She's [sic] seem to understand that he was, potentially, volatile. She was trying to stay away from the house. His -- his -- the text messages that were happening in those last couple of days were the -- the tone, the mood of the text messages changed rapidly. So, there might be a message with a threat in it, and -- and a couple of minutes later, a message that says, "I love you." It seemed that he was, sort of, attempting multiple tactics to get a response or to get in contact with Chrystal. There were a lot of death threats in those text messages. It just showed an escalation in his volatility.

Q. So, it'd be fair to say that, in your opinion, as -- in the last days, Kendall became more and more dangerous to Chrystal?

A. Yes. But I don't think she could've, necessarily known that. And to be honest, I don't think any of us, really, could have known that until after the incident. Because after the incident, when the investigators started to interview people, you could get a more complete picture of what had been happening. So, for instance, he had told a couple of people that he was -- he wouldn't be going to work. It -- he -- he did some things around the house -- take out the lightbulbs. He would [sic] told Chrystal this was going to be the end. He got out a life

insurance policy. He encouraged her to call her family. It -- these struck me as death preparation activities. The kind of activities that you commonly see before someone commits suicide or homicide/suicide.

Ms. Meeks also testified that based on the victim's previous actions, Ms. Meeks had the impression that he was planning a murder-suicide for Defendant, Defendant's son, Jalen, and himself. Ms. Meeks stated that prior to the incident, the victim was "unkempt," stated that he was not going to be at work due to a "plan," and told people that he and Defendant were "going to be on T.V. the next day." Ms. Meeks ultimately concluded that at the time of the shooting, Defendant "was in fear and that would be reasonable for the circumstances she was experiencing."

After witness testimony, the State and defense argued before the court. As for aggravating factors, the State argued that the crime committed was a serious offense and that Defendant used violence against the victim. The State also reiterated the loss sustained to Ms. Alexander, the victim's mother, as well as the victim's family. The State ultimately requested the court sentence Defendant to the maximum of forty years. In mitigation, the defense argued that Defendant was "a model citizen," "a wonderful person," and had "done great things." The defense ultimately requested that the court place Defendant on house arrest.

Thereafter, the trial court went on to sentence Defendant, stating:

> We have here before us today the sentencing of Chrystal Clues-Alexander -- and I'm going to refer to her as "Ms. Clues" now because I think that's the way she wants to be referred to. That's what I heard during the hearing.

> Ms. Clues was married to Kendall Alexander, who was the victim of this particular crime. They were married sometime in 2008, I believe, and had been in a relationship prior to that in what I could describe, probably, as a tumultuous relationship. It started sometime before the marriage and continued throughout the marriage.

> There were several instances of prior abuse that the Court had ruled on and is in the record in three different significant hearings that

the Court had. The Court allowed some of the evidence to be introduced into the record of some of the alleged battery -- batteries that Ms. --or domestic abuse that Ms. Clues has experienced. The Court did not allow some of them because they were not an exception to the hearsay rule.

Certainly, if Ms. Clues would have testified at a trial, she could have testified to all of the incidences. But, in order for them to come in as a separate incident without her testifying, it had to fit within the exceptions of the hearsay rules, and the Court had previously ruled on those[,] and those rulings are within the record of this case.

The facts, as testified to by Chrystal Clues-Alexander, are basically these at the Grand Jury.

She testified she asked Kend[a]ll for a divorce. Afterwards, Kend[a]ll told her he was going to pick up the Defendant's teenage son from his father. Kend[a]ll and Jalen never had a relationship. She testified instead of pulling back inside the apartment -- instead -- that instead, pulling her back inside the apartment -- when she went to go smoke, Kendall pulled her back inside the apartment by the hair, got her -- when she got her keys and told him that she was going to leave.

The Defendant claimed they struggled. He dragged her into the bedroom and locked the door behind him. According to the Defendant, Kendall kept threatening her and saying things like "Bitch, you're gonna [sic] die tonight."

She testified he grabbed around the neck with both hands and drug her across the bedroom dresser and had baskets with jewelry and perfume and stuff that just fell. She could hear it break and got on top of her, straddled her, and started banging her head on the ground.

It's at this point, she heard the gun rack and opened up her eyes to see Kendall pointing a gun at her. She testified Kendall pointed the gun at his own head, pulled the trigger to show her it was empty. According to the Defendant, Kend[a]ll pointed the gun at her and pulled the trigger as well. He told her she should not -- shouldn't worry because the gun was empty, but that he had enough ammo for her and Jalen too.

She claims she blacked out and when she came to, she was lying amongst the broken bottles of perfume. She could hear Kend[a]ll in the living room on the phone. It's at this point, she retrieved her gun from the basket and then she tried to leave. Kend[a]ll grabbed her, threw her into the recliner near the fish tank.

He began throwing "fists blows to my face," and she tried to block them. She testified he was going to kill her. At that point, he

started choking her. She was able to push him off and she shot him twice. Even though she shot him twice, Kend[a]ll continued to come at her. That's when she grabbed the phone and called her brother and -- wait -- she fired more rounds before she grabbed the phone to call her brother. The evidence is undisputed that she -- Kend[a]ll was shot approximately eleven -- in eleven different areas, probably ten bullets.

This is a sentencing hearing. She -- Ms. Clues pled guilty to manslaughter. All right. And the State has -- I mean, the Court has to review -- refer to the provisions of Article 894.1 and use those provisions as its guideline in determining the proper and appropriate sentence in this case.

I've gone through those guidelines[,] and I find the biggest thing in those guidelines is that Chrystal Clues has no criminal history. She's a pillar of the community. I've read, as Mr. Guilbeau said, probably a hundred letters. She's very active in her family and community life with her children. She experiences -- she was -- she experienced prior assaultive behavior from Mr. Alexander. She -- we heard three days of testimony of previous abuse by Mr. Alexander upon Chrystal. To say the least, it was a tumultuous relationship.

Some text messages were introduced, but those text messages don't have a date and time, nor do I know when these were made.

Beth Meeks, the domestic abuse battery intervention expert, testified. Domestic abuse battery, in my opinion, is more useful in a sentence -- in a defense of a case than it is in the mitigation of a case. It is a defense -- self-defense or justifiable homicide. It can also be used in mitigation under any other mitigating factor and the Court has considered the self-defense argument as a mitigation or -- not justification, but a mitigation or a reason why Ms. Clues may have done what she did.

She testified that Chrystal was in an abusive relationship and possibly facing murder-suicide based on the things that Kend[a]ll did just prior to the incident. She further has considered that Chrystal was in this relationship and that it was a tumultuous and bad relationship.

The testimony of Craig Allen was basically one about what happens when a body gets shot, and how fast we can turn, how fast one can turn in the body. That's the most things that this Court got out of Mr. Allen's testimony. And the sequence -- the sequential -- how fast of a sequence shots can be fired.

Mr. Allen testified although the physics -- as Mr. Holtzclaw called it, the "hearing evidence," was somewhat different, it was in a short period of time. The Court -- this Court believes that the shooting occurred in a three -- two, three, four second period of time, very

28

quickly. And that throughout the shooting, Mr. Alexander was turning, okay, and that's -- all the witnesses testified -- all the expert witnesses, both doctors testified that he was probably turning or the gun was moving around him in a fashion that caused the bullets to be lodged -- or entered in different areas of the body. That's what the Court got out of Mr. Allen's testimony.

Doctors Darbonne and Tape both testified that probably none of the torso shots were fatal, but the shot to the head was fatal. That Mr. Alexander would have survived had he received trauma care at an appropriate hospital. He may or probably would have survived because we have good trauma teams, he would have been provided blood and probably would have survived had he not had the head shot wound.

The head shot wound, to this Court's recollection, was perpendicular to the side of the head and traveled in a perpendicular manner, which means it was shot -- approximately, the head was 90 degrees to the gun, okay. Now, whether it was laying down, whether it was upright, no one can say. Both doctors did testify that there was little or no movement after this shot, undoubtedly. So[,] this Court probably thinks that the last shot was the head shot because there would have been no more movement.

The provisions of Article 894(B)(9) provide the offence resulted in significant permanent injury or significant economic loss to the victim or his family.

The Court finds that there is significant economic loss and significant social loss to this family. Life insurance does not replace a human being. Kend[a]ll was just as important to the Alexander family as Chrystal is to the Clues family. It's the ultimate crime. The killing of a human being is the ultimate crime that one could commit in society.

(B)(10), the offender used a dangerous weapon in the commission of the offense. A 45-caliber Glock handgun was used[,] and the victim was shot at least 10 times.

(B)(12) -- (B)(22), the Defendant did not contemplate that his conduct would cause or threaten serious harm. Defendant's criminal conduct caused serious harm. Ultimate death is the ultimate harm one can cause to another human being.

(B)(24), the Defendant acted under strong provocation. The Court has considered that the Defendant was the recipient of domestic abuse. The Court has considered this in its imposition of the sentence that it will impose at the end of this sentencing -- at the end of this colloquy.

(B)(25), there was [sic] substantial grounds tending to excuse or justify the Defendant's criminal conduct, though failing to establish the defense. Battered Woman Syndrome is a defense that can be used as justifiable homicide or self-defense. It can also be considered by the Court as a mitigating factor even though it doesn't rise to the to the level of self-defense. The Court has considered that in -- as a mitigating factor in imposing this sentence.

(B)(26), the victim of the Defendant's crime -- criminal conduct induced or facilitated its commission. The victim's criminal conduct induced or facilitated its commission. Mr. Guilbeau has pointed out in the memorandum -- and I'm a little bit perplexed about it -- that Chrystal was the -- was the recipient of an aggravated battery. Although Chrystal testified to a gun being present in the alleged exchange that predated the shooting -- that preceded the shooting, I should say -- an aggravated battery. She testified there was a weapon present. At the crime scene, there was no weapon discovered except for the shotgun in the closet. There was no pistol found that Chrystal testified to at the Grand Jury, so she couldn't have been a recipient of an aggravated battery, there was no weapon used by Kend[a]ll upon her, by her own admission.

Second degree battery. Possibly. There might have been extreme pain, suffering, physical disfigurement, or those natures, those things required of a second degree battery. Although the records from the hospital show a bruise on her chest or a red mark on her chest.

Aggravated kidnaping, I think that requires a weapon, and there was no weapon produced. Additionally, attempted second degree murder, there was -- although it could conceivably be that there was some intent to inflict death or great bodily harm. It was a tumultuous relationship. They had an argument. They had a fight, but I don't know [if] it rose to the level of attempted second degree murder. There's another one --

As I said previously, Ms. Clues has no criminal history. No prior conduct that would be even remotely related to criminal conduct. The Court finds that the Defendant's criminal conduct is unlikely to reoccur. That's true. She's been out on, I guess, not even bail, but she has been released pending sentencing for eight years now, nine years now and hasn't reoffended, reoccurred. We've never heard anything out of her.

The Defendant is particularly likely to respond to probationary treatment. I can't give her probation on manslaughter. That's not allowed; it's a hard labor sentence.

(B)(31), the imprisonment of the Defendant would entail excessive hardship to himself or his dependents. Imprisonment will entail excessive hardship to the four year old autistic child. The Court

is aware of that. I feel for him and his family. There is also a dead man out there, and that family cannot ever have close contact with him again.

There's no pretrial drug program that she participated in, of course, that was not a concern of this Court.

The aggravating factors are the loss of life. In the Court's eyes, after the plea agreement is very significant in its course -- in this case. The Defendant pled guilty to the reduced charge of manslaughter from the indictment of second degree murder.

She had an opportunity to go to trial if she felt that she would prevail or could induce the jury to award her self-defense or even manslaughter, possibly. She got a significant benefit from this in that she's not exposed to a life imprisonment sentence, but is subject to a definitive length of sentence in which she will -- she may eventually [sic] good time discharge from imprisonment.

The Court finds that a lesser sentence that the Court would give would deprecate the seriousness of the offense. The Court cannot give probationary treatment.

Therefore, Chrystal Clues-Alexander, on the charge of manslaughter in Docket Number 14-247175 in violation of 1430 point -- I think it's 30.1, 31? Let's see.

In violation of manslaughter 31 - 14:31, I sentence you to 252 months at hard labor. For the purposes of that sentence, I remand you to the sheriff of St. Martin Parish for the execution of that sentence.

After Defendant was sentenced, defense counsel made a general objection. Defense counsel also filed a written motion to reconsider sentence, asserting that Defendant's sentence was excessive. However, the trial court denied the motion without a hearing.

Defendant now argues that the trial court failed to properly consider the sentencing factors of La.Code Crim.P. art. 894.1 and that her twenty-one-year sentence is blatantly excessive. Specifically, Defendant asserts that the trial court primarily focused on the aggravating factors, instead of focusing on the several mitigating factors, when imposing her twenty-one-year sentence. According to

31

Defendant, the sentence imposed by the trial court was twice as long as the sentence recommended by Marie Alexander, the victim's mother. Defendant further claims that her twenty-one-year sentence is excessive in comparison to other sentences imposed for similar cases. To assist in her claim, Defendant cites *State v. Capdeville*, 438 So.2d 1310 (La.App. 3 Cir. 1983), wherein the defendant was convicted of manslaughter after shooting her abusive husband and subsequently sentenced to five years, and *State v. Murphy*, 600 So.2d 769 (La.App. 5 Cir. 1992), wherein the defendant was convicted of manslaughter and sentenced to fifteen years after stabbing her abusive husband. All in all, Defendant argues that her twenty-one-year sentence is excessive.

On the other hand, the State argues that the trial court adequately considered the sentencing factors of La.Code Crim.P. art. 894.1 and that Defendant's sentence is not excessive. According to the State, Defendant received a significant benefit by pleading guilty to the lesser charge of manslaughter, which reduced her sentencing exposure from mandatory life to up to forty years. The State further claims that Defendant "was less than truthful on multiple occasions" regarding the events that led to the shooting. All things considered, the State contends that Defendant's twenty-one-year sentence is not excessive and that the trial court did not abuse its discretion in imposing the twenty-one-year sentence.

In *State v. Necaise*, 466 So.2d 660 (La.App. 5 Cir. 1985), the defendant claimed she shot and killed her husband in self-defense. The defendant was subsequently found guilty of manslaughter and was sentenced to twelve years. The defendant appealed her sentence, arguing that it was excessive. At that point in time, the sentencing range for manslaughter was from zero to twenty-one years; thus, the

defendant received a mid-range sentence.  On appeal, the fifth circuit affirmed the

defendant's sentence, stating:

> We are impressed by the serious thought given the sentence by the dedicated trial judge, as reflected by his reasons stated above. Sympathy naturally flows toward a wife who has suffered the beatings, indignities, and terror that the victim obviously inflicted on the defendant at various times. However, our law does not forgive or condone the taking of a human life, no matter how wretched, except in self-defense and, under the particular circumstances of this case, we do not find the homicide justifiable nor the sentence imposed upon Mrs. Necaise excessive. She emptied her gun into her husband while he was apparently asleep, presenting no active threat to her. She then wiped the gun and the empty shell casing "clean" of fingerprints and went off to find her brother at a local night spot. Since the trial judge only sentenced the defendant to 12 out of a possible 21 years, it is evident that he considered the victim's past violent behavior toward the defendant, her prior lack of arrests or convictions, and her record of employment, in deciding upon his choice of sentences. Over the last five years, we have found sentences of from 3 years to 15 years for similar crimes. Therefore, we find this assignment without merit.

*Id*. at 671.

In *State v. Waldrop*, 07-1605 (La.App. 4 Cir. 6/18/08), 987 So.2d 874, *writ*

*denied*, 08-1682 (La. 4/3/09), 6 So.3d 767, the defendant pled guilty to manslaughter

and was sentenced to twenty-two years after stabbing her boyfriend.  The defendant

subsequently appealed her sentence, arguing that it was unconstitutionally excessive

"given the mitigating factors of her mental illness, lack of criminal history and the

victim's provocation." *Id*. at 876.   On appeal, the fourth circuit affirmed the

defendant's conviction and sentencing, stating:

> In the instant case, the defendant pled guilty to the reduced charge of manslaughter and to obstruction of justice. The trial court then ordered a pre-sentence investigation report from the Department of Probation and Parole. At the sentencing hearing on September 6, 2007, the court stated:
>
> > I have received the presentence report to assist me in determining an appropriate sentencing, using the sentencing guidelines.

> I have reviewed the facts supporting the plea and the facts contained in the presentence report contained under the Sentencing Guidelines in the Code of Criminal Procedure article 894.1.

Later in the proceedings, the trial court stated:

> I do want to make it a part of the record, because the PSI refers to it. But I also have a report from Dr. Salcedo, because defendant made that an issue in this case, that in regards to her having some mental problems, or that she was an abused victim in this matter.

The trial court then discussed at length the findings by Dr. Salcedo that Ms. Waldrop was a victim of domestic violence in prior relationships and that her relationship with the victim was violent and complicated by substance abuse. However, the trial court noted that he found no evidence to support the defendant's claim that she was physically abused on a regular or daily basis. Furthermore, the trial court noted that although both Dr. Salcedo and Dr. Richoux documented Ms. Waldrop's mental disorder and her treatment history, both acknowledged that her mental disability did not deter her from knowing right from wrong when she committed the offense. The trial court then sentenced Ms. Waldrop to twenty-two years on the manslaughter charge and ten years on the obstruction of justice charge and ordered the sentences be served concurrently.

At a hearing on Ms. Waldrop's motion to reconsider the sentences held on October 18, 2007, the trial court denied the motion, stating:

> The court was very particular about its review of the evidence that it had received for the pretrial sentencing. And in fact, the court was the instigator behind appointing mental health people to evaluate the defendant. And the court basically followed their conclusions that they were not convinced that any of these were proper defenses in mitigation of her being sentenced.

The record in this case clearly indicates that the trial court in imposing the sentences upon Ms. Waldrop gave great attention to the circumstances surrounding the death of Mr. Avis, relied on the presentence investigation report findings and  considered the opinions of Dr. Salcedo and Dr. Richoux. Thus, we find that the trial court adequately complied with La.C.Cr.P. art. 894.1.

> In her appeal brief, Ms. Waldrop cites several cases to support her argument that her sentence is excessive when compared to sentences received by other first time offenders or other defendants whose records contained many aggravating [sic] factors. She points to her mental illness, the fact that she was impaired when the event occurred, and the absence of a history of abuse against the victim as mitigating factors in her case.
>
> . . . .
>
> In this case, we find that the trial court complied with La.C.Cr.P. art. 894.1 and that the sentences are not unconstitutionally excessive. Thus, we find no merit to Ms. Waldrop's assignment of error.

*Id.* at 877–79.

A review of the record reveals that the trial court articulated which factors it considered in accordance with La.Code Crim.P. art. 894.1 before sentencing Defendant. In mitigation, the trial court considered that Defendant had no criminal history, was a pillar in her community, had previously experienced assaultive behavior by the victim, and acted in self-defense. In aggravation, the trial court considered the fact that Defendant shot the victim at least ten times, the offense resulted in the victim's death, and the victim's family suffered both an economic and social loss. Although Defendant argues that she was in an abusive relationship with the victim, and witnesses attested to their tumultuous relationship, the trial court ultimately reasoned, when he sentenced Defendant to twenty-one years, that the victim lost his life. Furthermore, as stated by the trial court, Defendant could have been found guilty of second degree murder and could have been faced with a mandatory life sentence; however, she received a significant reduction in criminal penalties by pleading guilty to the lesser charge of manslaughter.

Therefore, we find Defendant failed to prove that the trial court abused its discretion by sentencing her to twenty-one years for the offense of manslaughter.

Moreover, Defendant's sentence is not so disproportionate to the severity of the offense as to shock the sense of justice.

## DECREE

We affirm Defendant's conviction and sentence. We direct the trial court to correctly inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**